## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 13 2015, 10:14 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Chris Palmer Frazier
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Richard C. Webster
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

William P. Guffey,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 13, 2015

Court of Appeals Case No.
70A01-1409-CR-410

Appeal from the Rush Circuit Court.

The Honorable David E. Northam, Judge.

Cause No. 70C01-1311-FB-757

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, William P. Guffey (Guffey), appeals his sentence following his conviction for aggravated battery, a Class B felony, Ind. Code § 35-42-2-1.5 (2013); battery resulting in bodily injury to a law enforcement officer, a Class D felony, I.C. § 35-42-2-1(a)(2)(A) (2013); and disorderly conduct, a Class B misdemeanor, I.C. § 35-45-1-3(a) (2013).

We affirm.

## ISSUES

Guffey raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its sentencing discretion; and

(2) Whether Guffey's sentence is inappropriate in light of the nature of the offense and his character.

## FACTS AND PROCEDURAL HISTORY

On the early morning of November 10, 2013, emergency personnel were dispatched to 7139 W. North Street in Arlington, Rush County, Indiana, on a report of a possible overdose. Rushville Police Deputy Douglas Keith (Deputy Keith) arrived as the medics were preparing to load Guffey, who was unresponsive, into the ambulance. Deputy Keith spoke with Guffey's wife, Deborah Guffey (Deborah), who stated that Guffey had consumed a large quantity of Adderall pills and alcohol. She also warned that when Guffey woke up, he would likely be combative.

[5] Deputy Keith accompanied the ambulance to Rush Memorial Hospital, and Guffey began regaining consciousness en route. As Deborah predicted, Guffey was uncooperative and aggressive. Upon arrival at the emergency room at approximately 4:00 a.m., Guffey threatened and verbally abused the medical providers, and he grabbed the hand of a nurse and twisted it as he yelled at her not to touch him again. Deputy Keith warned Guffey that if he continued to harass and harm the hospital staff, he would be arrested. Guffey was hooked up to an IV, and he drifted in and out of sleep for most of the morning. When he woke up, he was belligerent. He tried to pull his IV out, and he was loud, obnoxious, and profane. Guffey's continuous yelling disrupted the entire emergency department, so police officers were summoned two different times to help get Guffey under control. The officers warned Guffey that if they had to come back a third time, he would be arrested for disorderly conduct.

[6] In order to counteract the effects of the Adderall, a nurse administered multiple doses of Ativan. Whereas Adderall is a stimulant, Ativan is a downer that will reduce the heart rate and blood pressure and will help decrease the impulsiveness and agitation brought on by Adderall. As the day progressed, Guffey began to sober up, and with the help of the Ativan, he generally became more cooperative. However, he continued to have periodic outbursts, which were countered with additional doses of Ativan.

[7] Guffey made it clear that he wanted to leave the hospital, but his doctor was concerned that lethal doses of Adderall could still be in his system. In addition, there was a concern that Guffey might be suicidal and could harm himself if

released. The doctor thus gave Guffey the option of either remaining in the hospital voluntarily for twenty-four hours for observation or to be committed to a seventy-two hour lockdown at a psychiatric facility. Guffey agreed that he would stay at the hospital, so at approximately 2:00 p.m., he was moved from the emergency room to a private room where his vitals could be constantly monitored. However, just two hours later, Guffey decided that he was going to leave. He unhooked himself from the monitors and headed toward the exit.

[8] After discovering that Guffey had disappeared from his room, a nurse found him in the parking lot and tried to convince him to return to his room because he had not yet been discharged. When Guffey indicated that he was going home, the nurse asked him to let her remove his IV first. Instead, Guffey shouted obscenities and ripped the IV out of his arm and threw it on the ground. By this time, Sergeant Brent Campbell (Sergeant Campbell) had responded to the hospital's third call for help with Guffey.

[9] Sergeant Campbell was discussing the situation with the nurses and Deborah when Police Chief Craig Tucker (Chief Tucker) arrived. Chief Tucker—who had responded to the hospital's prior calls for Guffey—asked Guffey to quiet down, but Guffey just screamed that he wanted to leave and to smoke a cigarette. Deborah explained to Sergeant Campbell that if Guffey could just smoke a cigarette, he would readmit himself. Rush Memorial Hospital is a smoke-free campus, so in order to diffuse the situation, Sergeant Campbell suggested that Guffey could walk to a nearby restaurant's parking lot to smoke. Deborah conveyed the information to Guffey, and as Guffey crossed the

parking lot, he shouted "[s]omething to the effect of corn fed mother f***ing pussies" among other profanities. (Tr. p. 234).

[10] Based on the fact that Guffey continued to be excessively loud and disruptive, Chief Tucker approached Guffey and informed him that he was under arrest and asked him to put his hands behind his back. Chief Tucker took out his handcuffs and reached for one of Guffey's arms, but Guffey "pulled away and then turned his body into a bladed position which . . . would be like a fighting position." (Tr. p. 235). Guffey then shoved him in the chest, so Chief Tucker grabbed Guffey's shoulders and used a leg sweep maneuver to subdue him, but Guffey pulled Chief Tucker down with him. As the men fell to the ground, Chief Tucker's elbow shattered on impact. The "excruciating" pain prevented Chief Tucker from moving his arm, and Guffey was able to roll over on top of him and secure Chief Tucker in a headlock. (Tr. p. 273). While maintaining the chokehold, Guffey gouged Chief Tucker's eyes and scratched his face.

[11] Sergeant Campbell rushed to assist Chief Tucker, but he was unable to pull Guffey off of him. As Sergeant Campbell searched for a taser in Chief Tucker's belt, a nearby paramedic and EMT student came to Chief Tucker's aid, grabbing onto Guffey's arms to break the chokehold enough for Chief Tucker to slip his head out. Sergeant Campbell attempted to secure Guffey in handcuffs but noticed that blood was running down Chief Tucker's face. Realizing that Guffey was still jamming his fingers into Chief Tucker's eye sockets and appeared to be biting his face, Sergeant Campbell—with the help of a nurse bystander—grabbed Guffey by the hair and pinned his head down to the

pavement while they handcuffed Guffey. All the while, Guffey continued to scream profanities and fight—kicking Sergeant Campbell repeatedly in the back until he was placed in leg shackles. As the officers were arranging for Guffey's transport to jail, Guffey asked Chief Tucker, "[H]ow's your eye now bitch, how's that you pussy[?]" (Tr. p. 277). Chief Tucker required reconstructive surgery to repair his elbow; however, he no longer has full range of motion and continues to experience pain. Chief Tucker was also treated for a scratched cornea and the abrasions on his face.

[12] On November 12, 2013, the State filed an Information, charging Guffey with Count I, aggravated battery, a Class B felony, I.C. § 35-42-2-1.5 (2013); Count II, battery resulting in bodily injury to a law enforcement officer, a Class D felony, I.C. § 35-42-2-1(a)(2)(A) (2013); Count III, battery resulting in bodily injury to a law enforcement officer, a Class D felony, I.C. § 35-42-2-1(a)(2)(A) (2013); Count IV, disorderly conduct, a Class B misdemeanor, I.C. § 35-45-1-3(a) (2013); and Count V, resisting law enforcement, a Class D felony, I.C. § 35-44.1-3-1(a),(b)(1)(B) (2013).

[13] On August 4, 2014, the State filed a motion to dismiss Count III, battery resulting in bodily injury to a law enforcement officer as a Class D felony, which the trial court granted on August 11, 2014. On August 12-14, 2014, a jury trial was held. At the close of the evidence, the jury found Guffey guilty as charged, and the trial court entered a judgment of conviction on the same. On August 29, 2014, the trial court held a sentencing hearing. The trial court vacated Count V, resisting law enforcement as a Class D felony, based on

double jeopardy concerns. The trial court imposed a term of fifteen years on Count I; eighteen months on Count II; and 180 days on Count IV. The trial court further ordered that the sentences should all be served concurrently, for an aggregate sentence of fifteen years, with ten years executed in the Indiana Department of Correction (DOC) and five years suspended to probation.

[14]  Guffey now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sentencing Discretion*

[15]  Guffey claims that the trial court abused its sentencing discretion. Sentencing decisions are matters left to the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482, 490, *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). On appeal, we review a trial court's sentencing order only for an abuse of discretion. *Id.* It is an abuse of discretion if the trial court's "decision is 'clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom.'" *Id.* (quoting *K.S. v. State*, 849 N.E.2d 538, 544 (Ind. 2006)). Our supreme court has determined that in matters of sentencing, a trial court may abuse its discretion by failing to enter a sentencing statement, entering a finding of aggravating and mitigating factors that are unsupported by the record, omitting reasons that are clearly supported by the record and are advanced for consideration, or by including reasons that are improper as a matter of law. *Id.* at 490-91. If we find that the trial court has abused its discretion, we will remand for resentencing "'if we cannot say with confidence that the trial court would have imposed the

same sentence had it properly considered reasons that enjoy support in the record.'" *Sandleben v. State*, 22 N.E.3d 782, 796 (Ind. Ct. App. 2014) (quoting *Anglemyer*, 868 N.E.2d at 491), *trans. denied*.

[16]     In determining an appropriate sentence, the trial court identified Guffey's criminal record as a slight aggravator and the fact that the victim was a law enforcement officer engaged in his official duties (only for the aggravated battery charge) as a strong aggravating circumstance. The court considered the fact that Guffey led a law-abiding life for intermittent periods of time; that incarceration would be a hardship for his family; and Guffey's expression of remorse as slight mitigators. The trial court "note[d] that for the most part [the aggravating and mitigating factors] balance each other out and offset each other." (Tr. p. 414). However, with respect to Count I, Class B felony aggravated battery, the trial court found that because Guffey's victim was a law enforcement officer, the aggravating circumstances "substantially outweigh" the mitigators. (Tr. p. 415). Accordingly, the trial court imposed an enhanced sentence of fifteen years on Count I, of which five years was suspended to probation. *See* I.C. § 35-50-2-5 (2013) (requiring a fixed term of between six and twenty years for a Class B felony, with the advisory term being ten years). On Counts II and IV, respectively, the trial court imposed the advisory sentence for a Class D felony of eighteen months and the maximum sentence for a Class B misdemeanor of 180 days. *See* I.C. §§ 35-50-2-7(a); -3-3 (2013).

[17]     Guffey now claims that the trial court abused its discretion by failing to consider his mental illness as a mitigating circumstance "despite evidence in the

record supporting such a finding." (Appellant's Br. p. 11). We first note that Guffey did not cite his mental illness as a mitigating factor at the sentencing hearing. It is well established that a trial court is not required to "comb through [the presentence investigation report] and present mitigating arguments on behalf of the defendant when the defendant fails to act." *Bryant v. State*, 984 N.E.2d 240, 252 (Ind. Ct. App. 2013), *trans. denied*. Thus, Guffey's failure to proffer his mental health as "a mitigating circumstance to the trial court waives consideration of the circumstance on appeal." *Id.*

[18] Waiver notwithstanding, in order to establish that the trial court abused its discretion, Guffey must demonstrate "that the mitigating evidence is both significant and clearly supported by the record." *Weedman v. State*, 21 N.E.3d 873, 893 (Ind. Ct. App. 2014). However, the trial court is under no obligation "to accept a defendant's claim as to what constitutes a mitigating circumstance." *Id.* Nor is the trial court required to justify "why it did not find a factor to be significantly mitigating." *Sandleben*, 22 N.E.3d at 796. Our supreme court has identified "four factors that bear on the weight to be given to mental illness at sentencing":

> (1) the extent of the defendant's inability to control his or her behavior due to the disorder or impairment;
> (2) overall limitations on functioning;
> (3) the duration of the mental illness; and
> (4) the extent of any nexus between the disorder or impairment and the commission of the crime.

*Bryant*, 984 N.E.2d at 252 (quoting *Weeks v. State*, 697 N.E.2d 28, 30 (Ind. 1998)). Guffey asserts that the evidence establishes that he "suffered from an

'inability to control his . . . behavior due to [his] disorder or impairment'"—*i.e.*, that he had overdosed on Adderall and was on suicide watch for twenty-four hours. (Appellant's Br. p. 12).

[19] Even though Guffey did not raise his mental health as a mitigating factor for the trial court's consideration, during the sentencing hearing, he made a general request for the trial court to order a mental health evaluation and for the DOC to "follow through with that" as part of his sentence. (Tr. p. 376). As a result, the trial court's sentencing order provided:

> [Guffey] raised the issue of his mental health due to the events leading up to the incident in question. The evidence of the action of the medical providers was consistent with the protocol for a temporary [seventy-two] hour commitment that is used on a regular basis for short term drug induced issues. The [c]ourt does not find the issues supported by the evidence related to mental health or substance abuse issues constitutes a mitigating factor.

(Appellant's App. p. 17). In addition, at the sentencing hearing, the trial court stated that it had considered

> the fact that [Guffey] was . . . suffering from an overdose of [A]dderall and had exhibited suicidal ideations sufficient to cause medical professionals . . . to decide his condition required at least twenty-four hours of observation. . . . [T]he factors that the [c]ourt is supposed to consider in this . . . is the extent of these, of [Guffey's] inability to control his behavior. . . . I believe there was ample evidence to establish that or at least to argue . . . that through [the] time release . . . characteristics of the drug, he was affected more and sometimes less during the course of his time at the hospital. . . . [W]hether or not that was . . . during the period of . . . the confrontation . . . I don't . . . believe was conclusively shown. . . . [T]he overall limitation of [Guffey's] functioning again . . . went up and down . . . . [E]specially in cases when the . . . mental issues are drug induced. . . . I would not

. . . feel that . . . this would be considered a mental . . . issue . . . of long duration, and I suppose I would add if, if in fact he did have mental health issues above the alcohol induced ones . . . over a long, long period of time, . . . again he seems to have been able to control it . . . enough that he only had two prior misdemeanor . . . convictions. Again I just did not . . . consider the, . . . well I considered it but . . . I did not find that . . . there was adequate proof to establish that there were mental health issues to be considered a mitigating circumstance.

(Tr. pp. 410-11).

[20] It is clear that the trial court considered and specifically rejected Guffey's mental health as a mitigating factor. As such, Guffey is essentially requesting our court to reweigh the evidence, which we will not do. As stated above, the trial court was not obligated to accept Guffey's argument as to what constitutes a mitigating factor. *Weedman*, 21 N.E.3d at 893. Therefore, we find that the trial court did not abuse its discretion in deciding that Guffey's mental health was not a mitigating factor.

## II. *Appropriateness of Sentence*

[21] Next, Guffey claims that his sentence is inappropriate. Notwithstanding the fact that the trial court acted within its sentencing discretion, our court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we] find[] that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 7(B). Although Appellate Rule 7(B) "leaves much to the discretion of appellate courts," we are ever mindful of "the long-recognized principle that 'sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference.'" *Parks v. State*, 22 N.E.3d 552, 555 (Ind. 2014)

(quoting *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008)). Thus, the purpose of appellate sentence review "should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell*, 895 N.E.2d at 1225. Whether we will find a sentence to be inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224. Ultimately, we focus on "the length of the aggregate sentence and how it is to be served." *Id.*

[22] With respect to the nature of the offense, the record reveals that Guffey consumed large quantities of Adderall pills—for which he did not have a prescription—and alcohol. While being treated for the overdose at the hospital, Guffey was belligerent and disrupted the entire emergency department to the point that the police had to be called for assistance on three different occasions. After Guffey ripped out his IV and left the hospital, Chief Tucker and Sergeant Campbell attempted to diffuse the situation by allowing Guffey to go smoke, but Guffey continued to shout obscenities and interrupted the officers' investigation. Upon learning that he was being arrested, Guffey became violent. He shoved Chief Tucker in the chest, and when Chief Tucker attempted to subdue him, Guffey grabbed onto him and pulled him down to the ground, causing Chief Tucker's elbow to shatter. Thereafter, Guffey viciously attacked Chief Tucker, who was defenseless due to his level of pain. Guffey gouged Chief Tucker's eye sockets and scratched and bit his face. Guffey also

put Chief Tucker in a chokehold, and as he strangled him, the EMT student overhead Guffey tell him to "just die." (Tr. p. 222).

[23] When Guffey was eventually handcuffed, he bragged about the number of people it took to restrain him and about the injuries that he inflicted upon Chief Tucker. Chief Tucker's medical bills exceeded $32,000, and he required intensive therapy to rehabilitate his elbow. Despite the therapy, Chief Tucker will never regain full mobility in his elbow. He will experience pain for the rest of his life, which is expected to increase in severity as he ages, and, most likely, Chief Tucker will require additional surgery in the future.

[24] Guffey now asserts that he "did not enter into that situation deliberately attempting to attack the Chief and hurt him badly." (Appellant's Br. p. 13). We are not persuaded by Guffey's contention that this was "an instantaneous reaction to being touched and restrained in a moment when his entire physiological system was highly aroused as a result of an amphetamine overdose." (Appellant's Br. p. 14). Based on Deborah's warning to Deputy Keith that Guffey would probably be combative when he woke up, it is evident that Guffey is a hostile individual—perhaps more so when intoxicated. Although Guffey's emergency room physician, Dr. Russell Daugherty (Dr. Daugherty), testified that impulsiveness may be an effect of the Adderall, Dr. Daugherty also stated that "Guffey "presented more as . . . drunk than . . . the effects of being [on] Adderall." (Tr. p. 151). Moreover, Guffey's vitals actually indicated that he had been coming down off the effects of the Adderall during the twelve hours that he was hospitalized, and Dr. Daugherty testified that

Guffey was able to understand and retain what he was being told. Even though Adderall might contribute to impulsive behavior, Dr. Daugherty explained that it did not cause Guffey to be unaware of his conduct. If Guffey's belligerent behavior was solely the result of the Adderall overdose, Dr. Daugherty stated that he would have expected to see Guffey acting irrationally while his family was visiting shortly before the altercation, but he did not.

[25] As to the character of the offender, we recognize that Guffey has a relatively mild criminal record. In 1993, he was convicted of battery resulting in bodily injury as a Class A misdemeanor, and then in 2010, he was charged with a Class D felony for intimidation but ultimately pled guilty a Class B misdemeanor for disorderly conduct. Although his record consists only of two misdemeanor convictions, it is significant that the offenses are similar to those in the instant case because it demonstrates that Guffey did not learn from the consequences of his prior mistakes. Furthermore, even though there have been significant gaps of time between Guffey's convictions, based on the fact that he acquired and consumed Adderall—a controlled substance—without a prescription, Guffey was not necessarily leading a law-abiding life during that time.

[26] We further find that Guffey's conduct subsequent to the altercation is indicative of a poor character. Guffey callously asked Chief Tucker, "[H]ow's your eye now bitch, how's that you pussy[?]" and boasted about the fact that it took multiple people to restrain him. (Tr. p. 277). As Chief Tucker testified during the sentencing, "an individual who viciously attacks a police officer exhibits a

direct intent to attack peace and tranquility and his actions degrade the order valued by our greater society." (Tr. p. 393). Accordingly, we find that Guffey's sentence is appropriate based on the nature of the offense and his character.

## CONCLUSION

Based on the foregoing, we conclude that the trial court acted within its discretion in declining to find Guffey's mental health to be a mitigating circumstance. We further conclude that Guffey's sentence is not inappropriate in light of the nature of the offense and his character.

Affirmed.

Bailey, J. and Barnes, J. concur